**BRESNICK et al. v. UNITED STATES VITAMIN CORPORATION.**

**No. 95.**

Circuit Court of Appeals, Second Circuit.

Nov. 17, 1943.

Morris Kanfer, of Brooklyn, N. Y., for appellants.

C. P. Goepel, of New York City, for appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment dismissing a complaint upon claim five of Patent No. 2,007,108, issued to the plaintiffs' assignor, Harry Bresnick, on July 2, 1935. The invention was of a process and product to preserve the potency of "fish-liver oils of high vitamin content," and to mask their unpleasant odor and taste. Concentrates of these contain vitamins A and D of high potency, the first of which is particularly subject to "oxidation and deterioration," to prevent which, and to remove the objectionable taste of the oil, the patentee described the following preparation. A vegetable fat like cocoa butter—with sweetening and flavoring condiments—is continuously agitated by conching in a dry hot room until the moisture content is not more than one-half of one per cent. To this mixture, after being cooled to about 100 degrees Fahrenheit, the fish-liver oils are added and the new mix so made then thoroughly stirred. (If desired, lecithin can be first mixed with the oils.) Thereupon the mixture is reduced to about eighty-four degrees Fahrenheit and poured into moulds. The substance sets at about fifty degrees Fahrenheit. A good mixture is thirty-five to forty per cent of cocoa butter, fifteen per cent flavoring, forty per cent sweetening, and five to ten per cent of fish-liver oils. Other fats than cocoa butter may be used, and the extraction of the vitaminized oils from the fish-livers was

assumed to be part of the prior art. The Office allowed eight claims; the first two for the process; the other six for the product. All of the claims except three and five are specifically for either a "fish-liver oil" (claims one and two), or a "fish-liver oil having a high vitamin content subject to deterioration" (claims four, six, seven and eight). Claims one and two differ in substance only in that in claim one the fat is described as "a vegetable fat," and in claim two, as "cocoa butter." In claims three, five, six and seven the same element is described as "an edible dehydrated hard vegetable fat"; while in claims four and eight as merely "cocoa butter." Claim five differs from claim three only in the addition of lecithin; that element appears in none of the other claims, and, as we have seen, the disclosure makes its addition optional. Claim five, the only one in suit, is as follows: "A substantially anhydrous edible medicinal preparation comprising an intimate mixture of an edible dehydrated hard vegetable fat, a fatty material having a high vitamin content subject to deterioration and lecithin, said mixture having a moisture content substantially no greater than one and one-half percent of the mass."

The medicinal value of cod-liver oil had been appreciated long before it was known that there were such things as vitamins, to say nothing of any loss in their potency through oxidation. Its offensive taste had been the occasion of efforts to disguise it, among which that of Szigeti (1907, Brit. Pat. 3301) chanced to come very close to Bresnick's disclosure twenty-five years later. Szigeti recommended the following product: a mixture of hens' eggs with cod-liver oil and dextrine, to which were to be added certain "medicaments" not relevant; after these had been thoroughly mixed, they were added to a mixture of cocoa, sugar and vanilla, to which was later added more cocoa. The result was a solid, which could be still further thickened by adding more chocolate, containing "a very large proportion of cocoa fat"—cocoa butter. Had fish-liver oils of high potency replaced ordinary cod-liver oil this would have struck very near to claim three; and for that matter to claim five itself, for hens' eggs contain lecithin. It is of course true that Szigeti had no notion of preventing the loss in potency of the vitamins in cod-liver oil, and his disclosure was therefore pro tanto only a shot in the dark; but, so far as disguising the taste of fish-liver oils, he fully anticipated Bresnick's disclosure. Shortly afterwards—1910—Weiss (1910, Brit.Pat. No. 418) disclosed a mixture of cod-liver oil and lecithin without cocoa butter, designed apparently merely as a therapeutic combination. Upon their discovery it was supposed that the vitamins could be obtained only from vegetable matter; but it was known that they—particularly vitamin A—lost their potency when oxidized by exposure to air. As early as June, 1921, the well-known confectionery house of Page & Shaw exhibited to the American Medical Association a "Vitamine Chocolate" composed of materials carrying concentrates of vitamins A, B and C, cocoa butter—or "cocoa liquor"—sugar, and vanilla. A pamphlet which they later issued, declared that the concentrates could be secured by breaking down the cells containing the vitamins, and removing the inactive parts; but "that vitamine bearing materials have poor keeping qualities and that their vitamine potency is easily destroyed by alkali conditions, by contact with certain metals, by high temperature, etc. We avoid these various pitfalls through the entire process. Our vitamine chocolate is approximately thirty-two per cent cocoa butter, which, in addition to its food values, preserves the vitaminised chocolate indefinitely in any ordinary temperature the world over. Vitamine chocolate will retain its potency indefinitely." Thus, nearly eleven years before Bresnick's first application, the whole of claim three of the patent in suit was anticipated—except the moisture content—provided the phrase, "a fatty material having a high vitamin content subject to deterioration," be understood to include vitamins obtained from vegetable matter.

In 1922 a number of experimenters discovered that vitamins could be extracted from fish-livers; the present belief being that the animal derives them from vegetables and stores them in its liver. Several patents quickly followed for such extraction: Takahashi, No. 1,786,095, upon Japanese application as of February 10, 1923; Owe, No. 1,805,593, application filed July 8, 1926; Snelling, No. 1,947,315, original application filed November 24, 1926. In 1927 an application was also filed by "The British Drug Houses" for a method of extracting vitamins from lambs' livers, as "a substitute for fish liver oil." 1928, Brit.Pat. No. 289,187. Following

these the well known Dutch firm of van Houten and Zoon, on November 24, 1928, filed an application which resulted in 1930 Brit.Pat. No. 340,580. This, it is true, was limited to vitamin D produced by the irradiation with ultraviolet light of ergosterol (a fungus in rye seed). Nevertheless, it declared that there is always danger of this vitamin's being destroyed when exposed to air at higher temperatures, and it disclosed a process of dissolving it in cocoa butter to protect it against oxidization, "so that vitaminised cocoa-butter can be worked up simply into chocolate or cocoa-products, and in this manner durable chocolate or chocolate products containing vitamins are obtained" (page 1, lines 56-61). In a later patent (1931 Brit.Pat. 360,-282), the same patentees suggested that "other fats or substances" than cocoa butter might be used. Bresnick filed his first application in April, 1932; it was for any form of "vitaminized food," particularly any containing vitamins A and D, regardless of their source. Although it mentioned halibut livers as a source of A, it also mentioned irradiated ergosterol as a source of D. Halibut livers figure only as an example; so far as appeared, the source of the vitamin was not considered important. Cocoa butter, chocolate, and flavoring were added to make a "confection." This application was allowed to lapse, and was succeeded by another filed on February 5, 1934; this time, limited to "fish-liver oils." The product was a mix of cocoa-butter, honey and sugar, to which, after it had been thoroughly mixed, the fish-liver oil was added and thoroughly mixed in. This application, unlike the first, demanded that substantially all moisture should be eliminated.

Thus it appears that the plaintiffs are right in saying that the art had not anticipated a product of cocoa-butter, masking ingredients and "fish-liver oil having a high vitamin content"; and upon that novelty they stand. Putting aside for the moment the addition of lecithin in claim five, we shall consider the patentability of the disclosure as it reads without that feature: i.e. the validity of the other claims. The art had at least twice (in the Page & Shaw pamphlet, and in the van Houten & Zoon British patent) disclosed a mixture of vitamins of high potency with cocoa butter, sugar and a masking ingredient. We may at once dismiss as a patentable distinction the limitation of moisture to one and a half per cent; we can find no contradiction of the testimony that this necessarily followed from the composition as prescribed; all the elements having as little moisture as that. Invention had therefore to depend upon the application of the earlier method to vitamins obtained from fish-livers, instead of from vegetable matter, a step which, as we have already noted, Bresnick himself disregarded in his first application, apparently assuming that what applied to one, applied to the other. Finally, cocoa butter had been used as a carrier for vitamins extracted from lambs' livers, as was disclosed in Example 6 of the British Patent to "The British Drug Houses." That patent had appeared four years before Bresnick filed his first application; and van Houten & Zoon's first patent had appeared less than two years before.

■ We have repeatedly said that in judging whether a new combination is an invention, we regard the history of the art as of much greater importance than our own untutored judgment as to what advances demand imaginative originality in specialized fields. Nothing can be less reliable than our naive impressions based upon gross appearances; the books never tire of warnings against them. We have not that acquaintance with the subject-matter which alone could give them any value; we should resort to them only when all other means have failed. In the case at bar the history of the art very clearly indicates that the problem of preserving and masking vitamins derived from fish-livers was no different from that of doing the same to those derived from vegetables, or from mammalian livers. Certainly nothing suggests any difference. Yet even so, had the art waited long for the step (especially if there had been intermediate unsuccessful efforts) and if the step, when made, had been an answer for which the art had been looking, we might have yielded. That was not the situation. The interval was short; it was not filled by a single unsuccessful effort; when Bresnick's disclosure appeared, it fell flat. We say the last advisedly, because he never did more than a trifling business himself, and, although he sold out to a successor who "arranged for a contract of $20,000 over a period of years," that tells us really nothing. Aside from that, there is no evidence of acceptance by the art except that in a notice, warning the trade not to infringe, Bresnick named seven companies, as hav-

ing accepted licenses. What were their terms he did not say when on the stand he had his opportunity; nor indeed did he even confirm what he had put into the notice. The history of the art assures us that the disclosure was an obvious and valueless variant of a well-known process.

So much for the disclosure in general. The addition of lecithin in claim five need not detain us long. It appeared in Holmes No. 2,051,257, whose disclosure was particularly addressed to it as a "stabilizer" of halibut liver oil and other fish-liver oils; and whose application was filed on March 9, 1934, seven months before Bresnick's. Bresnick did not carry back his date, so far as concerns lecithin, except by his testimony that he had used it in the batch which he submitted to Parke, Davis & Co. some time in 1933. It is scarcely necessary to say that that, standing alone, would not serve; and it happens that it is contradicted, even as it stands. Bresnick filed his second application on February 5th, 1934—only a month before Holmes—and at that time he had no notion of lecithin as even an optional element in his invention. Even if he had added it to the batch he had sent to Parke, Davis & Company, he did not think of it as a discovery: in which he was quite right. It is therefore not necessary to discuss the use of lecithin by Szigeti in 1907 and Weiss in 1910.

■■■ We have disposed of the patent as a whole because it has seemed to us proper that it should not remain in the art as a scarecrow. There is, incidentally, an independent reason why claim five is invalid. As appeared at the outset in our analysis of the claims, only claims three and five speak in terms of anything but "fish-liver oil having a high vitamin content," or of "fish-liver oil," simply. Claims three and five must therefore be construed to have included other substances when they spoke of "a fatty material having a high vitamin content." Indeed, only so could the plaintiffs make even a plausible case for infringement. However, if the phrase has that scope, the claims cover any vegetable "material," at once "fatty," and of "high vitamin content," to say nothing of "mammalian livers" which Bresnick himself expressly excluded from his own later British patent (1937 Brit.Pat. 463,-655). There is nothing in the specifications to support such a claim, for only "fish-liver oils" are mentioned. Moreover, if we jump that defect, and assume that

the transition from "fish-liver oil having a high vitamin content" to "a fatty material" having such a content, needed no supporting disclosure because it was obvious, the patent is hoist with its own petard, for it has nothing which can possibly support any of the claims except precisely that transition. If claim five had been valid on any theory, it would have been so only if confined to "fish-liver oils." Since it cannot be so confined it would have been invalid, even if the other claims had been valid.

What we have already said makes it unnecessary for us to pass upon either the question of disclaimer or that of infringement.

Judgment affirmed.